## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**JEFFREY GOLDHOFF,**

      **Plaintiff,**

**v.**                                      **Case No: 5:22-cv-324-PRL**

**MAXENE SAUNDERS,**

      **Defendant.**

_____

### MEMORANDUM DECISION AND ORDER

Plaintiff Jeffrey Goldhoff filed this diversity action alleging state law claims for breach of contract and unjust enrichment arising out of a family inheritance dispute with his sister, Defendant Maxene Saunders. Following the Court's Order denying Plaintiff's motion for summary judgment on the unjust enrichment claim, the case proceeded to trial on both claims.

A one-day bench trial was held before me on August 28, 2023. At the conclusion of trial, the parties presented closing arguments but declined the opportunity to submit additional briefing or to file proposed findings of fact and conclusions of law. In accordance with Fed. R. Civ. P. 52, the following constitutes the Court's findings of fact and conclusions of law.

### I.   FACTUAL RECORD

The following facts were established at trial by a preponderance of the testimony[1] and documentary evidence in the record.

_____

[1] Plaintiff Jeffrey Goldhoff testified and presented the testimony of Defendant Maxene

Plaintiff Jeffrey Goldhoff, a resident of Missouri, and Defendant Maxene Saunders, a resident of Florida, are siblings and are the natural children of Bertram Goldfhoff.[2] The action is brought pursuant to diversity jurisdiction under 28 U.S.C. § 1332. The complaint establishes that the amount in controversy is at least $238,987.04. (Doc. 1).

Many of the relevant facts are undisputed. The parties' father, Bertram Goldhoff, died in Ohio on December 29, 2018, at the age of 100. Prior to experiencing a fall that led to a rapid decline in his health, he lived independently in his own home without a caregiver. On September 23, 2018, Maxene received an unexpected phone call informing her that emergency responders had been called to her father's home. Mr. Goldhoff had apparently fallen and "had been in that house there, three, four days, laying in there." (Tr. 64). Mr. Goldhoff was taken to the emergency room, treated for a bleeding sub-hemorrhage, and hospitalized. (Tr. 64). He later received care in a nursing home and in hospice.

Upon learning of her father's fall and hospitalization, Maxene traveled from her home in Florida to Ohio to help care for her father. She stayed for two weeks in September and then returned in November and stayed until January. Meanwhile, Mr. Goldhoff passed away on December 29, 2018. Maxene managed his affairs, the funeral, and all arrangements, including holding a shiva as is traditional in Mr. Goldhoff's faith. Her brother Jeffrey was not present for any of these events.

Maxene testified that, although Jeffrey had been appointed administrator of the estate,

---

Saunders. No other witnesses testified. The official transcript of the trial testimony has been filed with the Court. (Doc. 35). The Court will refer to the transcript as "Tr." followed by the appropriate page number.

[2] For the sake of clarity and considering the parties' family relationships, the Court will refer to Plaintiff Jeffrey Goldhoff as "Jeffrey," Defendant Maxene Saunders as "Maxene," and decedent Bertram Goldhoff as "Mr. Goldhoff."

he told her he wasn't able to do it. (Tr. 61). The siblings agreed that Maxene would serve as administrator. Through the spring and summer of 2019, Maxene was engaged in numerous efforts to manage her father's home and estate, including addressing water damage and mold in his home, distributing his personal property, managing repairs and the sale of the home, and managing his estate and finances. Maxene testified that taking on all those responsibilities resulted in the loss of her job and deterioration of her own health. (Tr. 60).

Mr. Goldhoff had two main categories of assets that required distribution. The first included assets that passed through the estate, including the home and a vehicle. Ultimately, Maxene received the vehicle (and the proceeds from its sale) and 70% of the proceeds of the sale of the home, while Jeffrey received the remainder. Jeffrey testified that he agreed to the unequal allocation in consideration for the effort Maxene had expended in managing their father's affairs. Regarding the allocation he stated, "She received more than her part. She got 70 percent of the house, she got his car, the other half of the inheritance. She got a lot more than I ever got from this." (Tr. 14). The second category included proceeds from financial accounts with pay upon death benefits. Those assets passed outside the estate and are the inheritance funds at issue in this case.

At some point, Maxene notified Jeffrey that she had been successful in having USB bank distribute checks as a payout from one of the decedent's accounts, and that each of them would receive a check for $153,503.49. Later, Maxene also obtained similar substantial checks from First Financial Bank and Huntington Bank in equal amounts payable to each sibling.

At this point, the parties' testimony is in conflict. Jeffrey testified that he had recently gone through a bitter and financially devastating divorce that had left him "living paycheck to paycheck." (Tr. 9). He explained that Maxene asked him in a telephone call what his

intentions were regarding the inheritance checks, and he replied he was going to deposit them. Jeffrey testified that Maxene told him "'[t]hat's the worst thing you can do,'" and suggested that his ex-wife, adult children, or his ex-wife's lawyers would learn of the inheritance money and that they might have access to his accounts. (Tr. 9-10). Jeffrey testified that "[s]he told me, 'If this money is discovered, your ex-wife and children will find a way to come after it. Do you want that to happen again? Do you want to be wiped out again?'" (Tr. 21). According to Jeffrey, Maxene suggested that he send the checks to her for safekeeping: "And she said, 'Now, I suggest [sic] let some time go by until things settle down, and when you say, I'll return it.'" (Tr. 10).

Jeffrey conceded that, at the time of his father's death, a marital settlement agreement had been reached in his divorce case, but that he nonetheless believed based upon advice of his attorney that his ex-wife or her lawyers "could still find a way to go after [the inheritance funds]." (Tr. 22). His understanding was "they could try," or "[t]hey could attempt it." (Tr. 23). He testified that Maxene told him "the ex-wife's attorney still has access to your account." (Tr. 20). According to Jeffrey, Maxene promised that she would hold the money for safekeeping and insisted that she would return the funds to him when he asked. (Tr. 13).

Jeffrey did, indeed, endorse the checks and send them to Maxene, and she deposited the funds in her own account. Jeffrey did not include any written instructions or restrictive endorsements on the checks when he returned the endorsed checks to Maxene, and there was no written documentation of an agreement that Maxene would hold the funds for Jeffrey. As to why he agreed to have Maxene hold the funds for him, Jeffrey explained, "[s]he's family. I trusted her. I thought that would be the best way for now, and she said, 'You have no other solution right now because it's possible they will find out.'" (Tr. 25). Jeffrey testified that he

did not ever agree to gift the funds to his sister or give her the funds in consideration for time and effort related to their father's estate. (Tr. 14).

After a considerable amount of time had passed, perhaps a year and a half or two years, Jeffrey and Maxene exchanged communications about the funds. At trial, Jeffrey testified that Maxime confirmed the amount of the funds in a voicemail message and asked him, "What do you want me to do with the money?" During a later phone call, according to Jeffrey, Maxene told him she would send the money back to him, although she did not. (Tr. 29). After having her recollection refreshed,[3] Maxene indeed admitted to having at least two communications with Jeffrey that were consistent with his testimony.

First, she admitted to leaving the voicemail message for Jeffrey regarding the balance in "his account" and confirming the balance of the funds. (Tr. 45). She also admitted to having a subsequent telephone conversation with Jeffrey during which he asked how much she was holding for him, and she "told him what was in the account." (Tr. 46). Maxene admitted to stating, "[e]verything that's coming to you is sitting right there. That's the total," and "[e]verything that you're entitled to is in your account, that's it." (Tr. 46). During the conversation, Maxene, by her own admission stated, "[i]t is what it is. You want to sue me, find an attorney and sue me," and "You know what, I'm withdrawing everything that's entitled to you, and I'll send it to you in the morning." (Tr. 46-47, 53-54). Maxene, however, did not withdraw any funds and send them to Jeffrey. (Tr. 54).

Jeffrey first initiated litigation against Maxene in Missouri, but the case was dismissed for lack of personal jurisdiction over Maxene. On July 18, 2022, Jeffrey initiated this action

---

[3] Defendant's objections regarding recordings used to refresh Maxene's recollection are addressed in detail below.

alleging claims for breach of contract and unjust enrichment. The amount in dispute is $238,987.04, the total of the endorsed checks that Maxene received from Jeffrey that were deposited into her own bank account and retained by her. (Doc. 25-2).

## II.   LEGAL STANDARDS

Under Florida law, an enforceable contract requires offer, acceptance, consideration, and sufficient specification of essential terms. *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). "Without a meeting of the minds on all essential terms, no enforceable contract arises." *Gen. Matter of T&B Contracting, Inc.,* 833 F.2d 1455, 1459 (11th Cir. 1987) (citations omitted). To establish a breach of contract claim, a plaintiff must prove that "(1) a valid contract existed; (2) a material breach of the contract; and (3) damages." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017).

A contractual obligation between two parties is not required to be pursuant to a written contract but may either be an express or implied contractual obligation. *See Rabon v. Inn of Lake City, Inc.,* 693 So. 2d 1126, 1129 (Fla. 1st DCA 1997). "A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." *Commerce P'Ship 8098 Ltd. P'Ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 385 (Fla. 4th DCA 1997) (en banc). To state a cause of action for breach of an oral contract, a plaintiff must allege facts that, if taken as true, demonstrate that the parties mutually agreed "to a certain and definite proposition and left no essential terms open." *W.R. Townsend Contracting, Inc. v. Jensen Civ. Constr., Inc.,* 728 So. 2d 297, 300 (Fla. 1st DCA 1999). Whether there has been a "meeting of the minds" is a question of fact. *See Graf v. Liberty Mut. Ins.*, 636 So. 2d 539, 542 (Fla. 5th DCA 1994).

Meanwhile, a claim for unjust enrichment is an equitable claim based on a legal fiction

that implies a contract as a matter of law, despite that the parties to such an implied contract never indicated by deed or word that an agreement existed between them. *Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 805 (11th Cir. 1999). To prevail on an unjust enrichment claim, a plaintiff must establish that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; (3) the defendant voluntarily accepted and retained the benefit; and (4) the circumstances make it unjust for the defendant to retain the benefit without paying the plaintiff. *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022) (citing *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 (Fla. 2004)).

Unjust enrichment only applies if there is no remedy under contract law, meaning there is no express contract agreed upon by both parties. *Butler v. Trizec Props., Inc.*, 545 So. 2d 710, 711 (Fla. 2d DCA 1988). Indeed, "Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *Diamond "S" Dev. Corp. v. Mercantile Bank,* 989 So. 2d 696, 697 (Fla. 1st DCA 2008); *see also Kovtan v. Frederiksen*, 449 So. 2d 1 (Fla. 2d DCA 1984) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter").

## III.   DISCUSSION

Plaintiff Jeffrey Goldhoff seeks relief on these two alternate legal theories, breach of contract and unjust enrichment. Neither party disputes that Florida law applies to the claims in this case. The Court will address each claim in turn.

### A.  *Breach of Contract*

Under Florida law, the elements of a breach of contract claim are: (1) that "a valid contract existed; (2) a material breach of the contract; and (3) damages." *Deauville Hotel Mgmt.,*

*LLC v. Ward*, 219 So. 3d 949, 953 (Fla. 3d DCA 2017). Upon consideration of all the testimony and evidence, the undersigned finds that Jeffrey has established a claim for breach of contract by a preponderance of the evidence.

Jeffrey testified repeatedly and consistently that Maxene persuaded him to endorse and mail the inheritance checks to her to hold temporarily so that he could avoid scrutiny into his financial affairs by his ex-wife, her lawyers, and his adult children. His testimony on this point was straightforward and unwavering. He explained that, although his martial settlement agreement had been completed, he understood based on counsel from his attorney that his ex-wife or her lawyers could nonetheless "try" to reach his inheritance funds. As he explained, Maxene suggested that he send her the checks for safe keeping until "everything is calm, things are forgotten." (Tr. 28). Jeffrey also consistently testified that Maxene promised to return the funds to him when he asked. Jeffrey's testimony was that this agreement was reached over the telephone. He concedes it was a "verbal" (meaning "oral") agreement, as opposed to a written one. (Tr. 27). In light of the entirety of the testimony and evidence, I find Jeffrey's testimony credible.

Maxene argues strenuously that, because the marital settlement agreement had been finalized, Jeffrey's ex-wife actually had no legal right to his inheritance funds, thus his testimony regarding the parties' agreement is not credible. The undersigned disagrees and finds that argument fails to acknowledge the nuances of the testimony in this case. Although Maxene's argument focuses on the fact that Jeffrey's ex-wife had no actual legal right to the inheritance, that argument disregards the complicated family dynamics at play and Jeffrey's mental and emotional state. According to Jeffrey's testimony, Maxene's insistence on his sending her the money was to hide its existence from his ex-wife and even his adult children.

Jeffrey testified that he was estranged from his adult children whom he perceived to be aligned against him. He described his daughter as "very money hungry." (Tr. 31-32). Notwithstanding a theoretical legal dispute, Jeffrey's testimony implies he and Maxene also sought to avoid a messy family dispute over any inheritance funds. Indeed, Jeffrey described his family by stating, "they seemed to all be plotting together." (Tr. 32). Though not necessarily logical, the notion that Jeffrey agreed to send his inheritance to Maxene to conceal it from his family is consistent with his beliefs and anxious state of mind at the time.

Further, the undisputed facts are consistent with Jeffrey's testimony regarding an agreement between the siblings. Jeffrey did, indeed, endorse and send checks totaling at least $238,987.04 to Maxene, and she deposited the funds into her own account. He did so during the same time frame that the estate was being resolved and the siblings agreed that Maxene would receive the vehicle and 70% of the proceeds of the house while Jeffrey received the remainder. This context makes it more plausible that Jeffrey gave the checks to Maxene to temporarily hold on his behalf, as opposed to as a gift or in consideration for her efforts regarding their father's affairs.

Jeffrey's testimony regarding the agreement is also consistent with Maxene's testimony. Maxene testified that she had communications with Jeffrey via voicemail and telephone regarding the funds, and that he asked her to determine how much money he had in her bank account from the checks, and she left him a voicemail in reply. (Tr. 38). Further, after her recollection was refreshed, Maxene admitted to leaving Jeffrey a voicemail message regarding the balance of the money and referring to the funds as "your account," meaning Jeffrey's account. Maxene also admitted to other revealing statements, including telling Jeffrey during a phone call, "[e]verything that's coming to you is sitting right there. That's the

total," and "[e]verything that you're entitled to is in your account, that's it." (Tr. 46). These statements are fully consistent with Jeffrey's testimony and his version of the facts regarding an agreement between the parties. I submit that these statements are also irreconcilable with the notion that, approximately two years prior, Jeffrey had gifted the funds to Maxene or given them to her as consideration for managing their father's affairs. If Jeffrey had gifted Maxene the funds approximately two years previously, it is illogical that she would have used the words, "your account," and "everything that you're entitled to is in your account." (Tr. 46). Maxene's testimony regarding her choice of words in the voicemail and the telephone call corroborate Jeffrey's testimony regarding the existence of an agreement. In other words, Maxene's admissions about what she told her brother over voicemail and over the phone suggest that she had, indeed, previously agreed to hold the funds temporarily for Jeffrey and to return them at some point.

Under the circumstances, it is plausible that the siblings reached an agreement regarding Maxene temporarily holding the funds for Jeffrey because the siblings had recently reached other agreements regarding their father's affairs. First, the siblings agreed (whether expressly or tacitly) that although Jeffrey was appointed administrator of the estate, Maxene would serve instead. The siblings also agreed that Maxene would receive the larger share of the estate and her father's vehicle. It is reasonable to conclude that the siblings may have also agreed to have Maxene hold Jeffrey's share of the inheritance funds temporarily. Each of these agreements is consistent with a pattern of Jeffrey delegating or deferring financial responsibilities to his older sister, whom he testified he trusted. (Tr. 25). While sending Maxene such a large sum of money to hold on his behalf may seem objectively ill-advised,

Jeffrey testified that this all occurred at a difficult time in his life following the end of his 36-year marriage, an acrimonious divorce, and his father's death.

That said, the undersigned acknowledges Maxene's testimony denying any such agreement. Notably, Maxene's testimony was somewhat inconsistent. First, she denied having any discussions over the phone or in person with her brother about the checks prior to him signing them and sending them to her and testified that she never spoke to him about the checks at all. (Tr. 34-35). She then testified that she did have a conversation with him to tell him that she was mailing his half of the checks. (Tr. 35). She denied any conversation regarding his children or divorce and claimed she "had no knowledge of that." (Tr. 36). She testified, "I was not aware there was a divorce." (Tr. 57). Later, upon prompting by her counsel, she clarified that it eventually "fell into place that I realized he's divorced now." (Tr. 61).

On examination by her counsel, she denied making any representation to Jeffrey that she would hold money for him to avoid his family finding out about it. (Tr. 56). Curiously, however, even without having her recollection refreshed, she previously testified that well after she received the checks from Jeffrey (that she claimed he had gifted to her), she and Jeffrey communicated about them. She testified "he asked me specifically how much were the checks that he returned to me. He wanted to know how much he had." (Tr. 37). She further testified, "he and I were back and forth on the phone calls. He had asked me at one point, 'Find out how much I have in your bank from the checks,' and I did that. He didn't answer the phone this one time. I left the amount on his voicemail." (Tr. 38). This testimony, together with her subsequent testimony regarding the statements she made in the voicemail

and phone conversation, appear to be an admission that she considered the funds Jeffrey's at that time.

Further, Maxene's testimony regarding why Jeffrey sent her the checks was not credible. She testified that he told her she had done a lot of hard work and that she deserved for him to sign the checks over to her. She claims he said, "I would rather have you have this money than give it to my wife." (Tr. 61). This testimony is not credible in light of the large sum of money involved, the fact that Maxene received her own equal share of an inheritance from her father's accounts, the fact that the siblings separately agreed to an unequal distribution of the estate in Maxene's favor (presumably to acknowledge her efforts managing her father's affairs), and Jeffrey's testimony that he was forced to delay retirement and was living "paycheck to paycheck" while working two jobs due to the financial impact of his divorce. (Tr. 9). It simply is not plausible that Jeffrey would have gifted well over $230,000 to his sister under these circumstances.

The Court, therefore, finds that the parties had a meeting of the minds resulting in their agreement that Maxene would temporarily hold the funds from the endorsed checks for a period of time and that she promised to return the money to Jeffrey upon request. Their meeting of the minds encompassed all essential terms, and each received consideration for the agreement. Jeffrey benefited (or intended to) by having his funds safeguarded by his sister, while Maxene benefited by receiving the funds, having her bank balance increase substantially, and potentially earning interest on the funds. Notably, Jeffrey's direct testimony regarding the phone call establishing the agreement is sufficient evidence to support this conclusion, but the weight of other evidence and testimony supports the same conclusion. The final elements of a breach of contract claim are also established. Maxene breached the

agreement by failing to return the funds as promised, and Jeffrey suffered damages by the loss of the funds.

### B.  Unjust Enrichment

In the alternative, and assuming for the sake of this analysis that no valid contract existed, the Court also finds that a preponderance of the evidence supports a claim for unjust enrichment. To prevail on an unjust enrichment claim, a plaintiff must establish that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; (3) the defendant voluntarily accepted and retained the benefit; and (4) the circumstances make it unjust for the defendant to retain the benefit without paying the plaintiff. *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022) (citing *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 (Fla. 2004)).

There is no dispute that Jeffrey conferred a benefit on Maxene in the form of the endorsed checks, and that Maxene appreciated, accepted, and retained the benefit. The parties do not dispute that the benefit was the total of the checks from USB and First Financial in the total amount of $238,987.04. Maxene testified that she did not return the funds to Jeffrey because she felt he was not entitled to them. (Tr. 54). Thus, the evidence establishes the first three elements of the unjust enrichment claim.

The undersigned also finds that a preponderance of the evidence establishes the final element, that circumstances make it unjust for Maxene to retain the benefit without paying Jeffrey. The same circumstances and evidence discussed above that make it implausible that Jeffrey gifted the money to Maxene make it unjust for her to retain the benefit without paying him. It is undisputed that the amount in question ($238,987.04) represents inheritance money to which Jeffrey was entitled. It is also undisputed that Maxene received an equal amount,

plus a larger share (70% v. 30%) of the proceeds of the estate. Notably, over a year or more after Jeffrey sent her the money, Maxene acknowledged Jeffrey's entitlement to the funds. Tellingly, that acknowledgement was made well after the conclusion of Maxene's efforts on behalf of the estate and to manage her father's affairs.

Regarding unjust enrichment, Maxene suggests that her efforts caring for her father and managing her father's affairs warrant her retaining the funds as consideration or renumeration. Maxene testified about traveling to visit her father when he was first hospitalized, returning when his condition deteriorated, and planning his funeral and shiva. She also testified regarding her substantial undertakings to settle her father's affairs, manage his personal property and home, and manage the estate. In response to questions by the Court, she testified that, prior to losing her job as a nurse, she was making between $60,000 and 70,000 per year. (Tr. 69).

Even if all of Maxene's testimony regarding her efforts following her father's death is fully credited, the $238,987.04 that she retained (that was otherwise the rightful inheritance of Jeffrey) is out of proportion to the value of those efforts. This is especially true when she also received the same amount of inheritance and separately received a 70% share of the proceeds of the estate, her father's personal property, and vehicle. That her activities led to the loss of her job and deterioration of her own health is unfortunate. Yet, she remained in Ohio of her own free will instead of returning to her home in Florida. While obviously not her preference, she might have delegated her work to property managers, real estate agents, estate attorneys, or other agents, or managed things remotely. Handling a deceased parent's affairs is a thankless, but common and inevitable task for many adult children. Notably, although Maxene traveled to Ohio to be with her father following his accident, she was not

his primary caregiver. The evidence established that he was hospitalized and receiving care in the hospital, in a nursing home, and eventually through hospice between his fall in September 2018 and his death on December 28, 2018.

In the context of the unjust enrichment claim, I find that Maxene's efforts, though commendable and valiant, were not so remarkable under the totality of the circumstances to justify her keeping $238,987.04 to which she was not entitled. This is especially true because she had already received a larger share of the estate, presumably by agreement and in acknowledgement of her efforts.

### C.  Recordings Used to Refresh Maxene's Recollection

The Court now turns to objections raised by Defendant during the trial related to audio recordings used to refresh Maxene's recollection. These objections were overruled at trial.

Plaintiff's counsel refreshed Maxeen's recollection with audio recordings on two different occasions during her testimony. The first instance occurred when counsel for Plaintiff asked Maxene whether she could recall making certain statements to Jeffrey in a voicemail to him. (Tr. 38). Plaintiff's counsel asked Maxene a series of questions regarding what she said in that message and whether she used the words "the account," or "your account." (Tr 38-39). In response to whether she had used the phrase, "your account," Maxene replied, "[a] slip of the tongue, I might have. I don't recall at this point." (Tr. 39).

Plaintiff's counsel then sought to play the audio recording of the voicemail to refresh her recollection. (Tr. 39). Defendant objected on the basis that it was an improper method to refresh recollection, was not listed as an exhibit in the Pretrial Statement, and is not a writing under Rule 612 of the Federal Rules of Evidence. The parties established that the recording had been provided in discovery in the case. At the Court's invitation, Plaintiff's counsel then

- 15 -

asked Maxene if hearing the recording would help her remember what she said and she replied affirmatively. (Tr. 40). The recording was played, following which Maxene's recollection was refreshed and she was then able to recall using the phrase "your account" on the voicemail to Jeffrey. (Tr. 45).

Plaintiff's counsel next asked Maxene about statements she made in a telephone conversation subsequent to the voicemail. (Tr. 46). Initially, drawing on her present recollection, she was able to recall making the statements asked about, and confirmed that she said, "your money," and "Everything that's coming to you is sitting right there," and similar statements. (Tr. 46). Maxene was then asked if, just prior to hanging up, she said "You know what, I'm withdrawing everything that's entitled to you, and I'll send it to you in the morning." (Tr. 47). She replied, "I *may* have said that." (Tr. 47) (emphasis added). Counsel then asked if hearing the recording of the call would refresh her recollection and she replied, "You can play it." (Tr. 47).

Through counsel, Maxene then renewed her prior objection and raised the additional objection that Florida law requires both parties to consent to a recording, and that the conversation was illegally recorded. (Tr. 48). In response, Plaintiff argued that Missouri (where Jeffrey was located) is a one-party recording state. (Tr. 48-49). In any event, Plaintiff argued that he was not attempting to use the recording for any substantive purposes, but only to refresh recollection and perhaps for impeachment if necessary. (Tr. 50). The Court agreed that the threshold question was whether the recording would refresh the witness's recollection and that the recording could be played at least to make that determination. After the recording was played, Maxene answered affirmatively that it had refreshed her recollection and then proceeded to confirm making the statements to Jeffrey. (Tr. 53).

At the conclusion of the trial, the parties revisited these issues and the Court reiterated that the recordings themselves were not evidence but were only used to refresh the recollection of the witness. (Tr. 103). The parties concurred that the recordings were only used for refreshing recollection and not impeachment, and that they were not introduced into evidence in any capacity. (Tr. 104). The Court also confirmed it was only relying on the testimonial evidence and not the recordings themselves. (Tr. 104). With those clarifications, the parties declined the opportunity to provide further briefing on the matter.

Upon further consideration, the undersigned confirms these prior rulings. Although defense counsel initially objected based on Fed. R. Evid. 612, that rule merely provides options for an adverse party when a writing is used to refresh recollection. As the Court stated during trial, Rule 612 does not preclude the use of a recording to refresh recollection. Moreover, the parties acknowledged that the recordings were produced during discovery. As the Court reasoned during trial, Rule 613 is more applicable in this instance because Maxene was examined regarding her prior statements. Even so, it was not necessary to invoke that rule because the recordings were never introduced into evidence and were only used to refresh her recollection. Defendant's objections based upon Florida being a two-party recording state were also properly overruled because the recordings were never introduced into evidence. The recordings merely served to jog Maxene's memory, and she was then able to directly testify about her prior statements with her refreshed recollection. The recordings were never sought to be admitted into evidence. It is therefore irrelevant whether the recordings would be admissible as evidence, and the Court need not reach the issue of whether the Missouri or Florida's statute would apply.

The distinction between "evidence" and "non-evidence," and "present recollection revived," versus "past recollection recorded" has been eloquently addressed by many jurists, including Learned Hand in *United States v. Rappy,* 157 F.2d 964, 967 (2d Cir. 1946), who wrote: "Anything may in fact revive a memory: a song, a scent, a photograph, an allusion, even a past statement known to be false." Similarly, Judge Moylan of Maryland addressed the question of what latitude a judge should allow when a witness is unable to remember. *See Baker v. State*, 35 Md. App. 593, 602–03, 371 A.2d 699, 704–05 (1977) (reversing and remanding for a new trial where trial judge erred by refusing to allow defendant the opportunity to refresh the present recollection of police officer by showing him a report written by a fellow officer). Judge Moylan wrote:

> Not only may the writing to be used as a memory aid fall short of the rigorous standards of competence required of a record of past recollection, the memory aid itself need not even be a writing. What may it be? It may be anything. It may be a line from Kipling or the dolorous refrain of 'The Tennessee Waltz'; a whiff of hickory smoke; the running of the fingers across a swatch of corduroy; the sweet carbonation of a chocolate soda; the sight of a faded snapshot in a long-neglected album. All that is required is that it may trigger the Proustian moment. It may be anything which produces the desired testimonial prelude, 'It all comes back to me now.'

*Id* at 704-5. Indeed, the esteemed Wm. Terrell Hodges of this Court was known to lecture to his law clerks on this very point, remarking that a witness's recollection can be refreshed with anything, even a ham sandwich.

For further context, while the recordings in this case do not implicate such issues, it is worth noting that illegally obtained wiretap evidence may be used by the prosecution for impeachment in a criminal case. *See United States v. Simels,* 654 F.3d 161, 169 (2d Cir. 2011) (collecting cases and observing that "[a]ll of the circuits that have considered the issue have

held that unlawfully obtained wiretap evidence may be used by the prosecution for impeachment in a criminal case.").

Even if the recordings were played improperly, there would be no prejudice to Maxene and no impact on the Court's findings of fact and conclusions of law. This was, after all, a bench trial, and the undersigned is fully capable of disregarding the recordings themselves and relying solely on the testimonial evidence. And, as explained above, there is ample testimony and evidence to support the Court's findings and conclusions even absent Maxene's testimony after having her recollection refreshed. Indeed, even prior to having her recollection refreshed, Maxene admitted that she responded to Jeffrey's inquiry regarding how much he had in her bank from the checks, and that she replied by leaving the amount in a voicemail message. Likewise, the bulk of her testimony regarding the subsequent telephone call in which she referred to Jeffrey's entitlement to the money occurred without the need for her recollection to be refreshed. As to the telephone call, the only statements regarding which she needed her recollection refreshed were the final statements. The few statements admitted to by Maxene after her recollection was refreshed are only ancillary to the Court's conclusions in this case.

### D.  Unclean Hands Defense

The Court now turns to the defenses raised by Maxene. As explained above, I find that the evidence does not support the defenses of renumeration, consideration, or gift. As to the affirmative defense of unclean hands, Jeffrey argues that defense fails because Maxene was not injured in any way by his conduct, and because she did not rely on his alleged misconduct.

Unclean hands is an equitable defense that is akin to fraud; its "purpose is to discourage unlawful activity." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir.1992). "It is a self-imposed ordinance that closes the

doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief[.]" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "Equity will stay its hand where a party is guilty of conduct condemned by honest and reasonable men. Unscrupulous practices, overreaching, concealment, trickery or other unconscientious conduct are sufficient to bar relief." 22 Fla.Jur.2d, Equity, § 50. To establish a defense of unclean hands, the defendant must have relied on the plaintiff's misconduct. "The fact that a party's conduct is disreputable is entirely irrelevant where the party asserting unclean hands is not the target of, and has taken no action in reliance on that conduct, however disdainful of that conduct a court may be." *McCullum v. Chidnese*, 832 So.2d 194, 196 (Fla. 4th DCA 2002), In addition to acting in reliance on the misconduct, the defendant must also prove a harm that was caused by the misconduct. *Jelic v. CitiMortgage, Inc.*, 150 So.3d 1223, 1225 (Fla. 4th DCA 2014).

As the Court noted during closing arguments, the defense of unclean hands is largely moot or inapplicable in this case because the evidence established that there was no legal basis for the need for Jeffrey to conceal his inheritance funds from his ex-wife. Jeffrey's argument, that was supported by the evidence, was that he was in a very emotionally difficult phase of his life at the time he and Maxene reached the agreement, he had just been financially and emotionally devastated by his divorce and the end of his 36-year marriage, and that he believed it was possible for his ex-wife and her lawyers to reach or scrutinize his inheritance funds. He testified that, although his martial settlement agreement was final, his attorney had advised him his ex-wife's attorneys could still "try." The weight of the evidence was that under Missouri law and because the martial settlement agreement had been finalized, Jeffrey's ex-wife would have had no valid claim to his inheritance funds. As the Court observed during

trial, it is possible that Jeffrey was simply mistaken about the law and the supposed need to hide the inheritance. It is also plausible he wished to conceal the inheritance out of a desire for privacy or avoiding a family dispute with his estranged relatives whom he described as "money hungry."

Further, Maxene failed to establish the necessary elements of the unclean hands defense. Not only was Jeffrey's conduct not illegal or necessarily disreputable given his actual legal rights, but Maxene was not the target of, nor did she act in reliance upon, the alleged misconduct. *See McCullum*, 832 So.2d at 196. Based on the testimony presented at trial, I find no sufficient evidentiary basis to support the defense of unclean hands.

## IV.   SUMMARY

Upon due consideration, I find that a preponderance of the testimony and evidence establishes that the parties had an agreement that Maxene would hold Jeffrey's share of the inheritance funds for him and return them at a later time upon request. That conclusion is also the most plausible explanation of events considering the totality of the evidence. Maxene subsequently breached that agreement when she failed to return the money to Jeffrey. Even if the evidence did not establish a valid agreement between the parties to support a breach of contract claim, it does support an equitable claim for unjust enrichment. There is no question that Maxene voluntarily accepted and retained the funds that were Jeffrey's share of the inheritance, and I find that the overall circumstances make it unjust for her to retain that benefit without paying Jeffrey.

## V.    CONCLUSION

Based on the forgoing, the Clerk is directed to enter final judgment in favor of Plaintiff

Jeffrey Goldhoff and against Defendant Maxene Saunders in the amount of $238.987.04. The

Clerk is further directed to terminate all pending motions and close the file.

**DONE** and **ORDERED** in Ocala, Florida on September 22, 2023.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties